UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 08-22585-CIV-UNGARO

MARIO MENA,

    Plaintiff,

v.

MCARTHUR DAIRY, LLC,

    Defendant.
_____/

### ORDER ON MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment and Memorandum of Law in Support, filed March 27, 2009. (D.E. 20 & 23.) Plaintiff filed his Response in opposition on April 13, 2009. (D.E. 27.) Defendant filed its Reply in further support of its Motion on April 23, 2009. (D.E. 34.) Accordingly, the Motion is now ripe for adjudication.

THE COURT has considered the Motion and the pertinent portions of the record and is otherwise fully advised in the premises.

### BACKGROUND AND FACTS[1]

Defendant is a subsidiary of Dean Foods Company ("Dean Foods") and manufactures,

---

[1] Defendant has submitted a statement of material facts in support of its Motion, (D.E. 22), and Plaintiff has submitted a response to Defendant's statement of facts. (D.E. 28.) To the extent that Plaintiff does not controvert the facts alleged by Defendant and those facts are supported by the record, the Court adopts the facts contained within Defendant's statement. *See* S.D. Fla. L.R. 7.5.D ("All material facts set forth in the movant's statement filed and supported as required by Local Rule 7.5.C will be deemed admitted unless controverted by the opposing party's statement . . ."). To the extent that Plaintiff (the non-movant) controverts the facts alleged by Defendant with evidence, the Court will adopt the facts set forth by Plaintiff. *See Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

1

distributes, and exports dairy and beverage products throughout Florida, the Caribbean, and Central America. (Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶ 1.) Dean Foods owns and operates Defendant's operations. (DSUMF ¶ 1.) Dean Foods sells milk and a range of related products under more than 50 well-known local and regional brands and has plants, distribution points, and other establishments in 35 states. (DSUMF ¶ 3.)

At its plant in Miami, Florida, Defendant produces pasteurized and homogenized milk. (DSUMF ¶ 6.) Defendant also distributes a wide variety of dairy and related products that are produced or manufactured by Dean Foods's plants in other states, including Virginia, Texas, Kentucky, and South Carolina. (DSUMF ¶ 6.) Defendant receives the out-of-state products[2] at its Miami facility already packaged and ready for delivery and does not change or modify such products prior to delivery. (DSUMF ¶ 6.) Defendant holds the products it receives from outside Florida at its distribution center until they are ready to be loaded onto Defendant's delivery trucks. (DSUMF ¶ 11.) Defendant's "loaders" then load and secure the products onto Defendant's trucks, including tractor-trailers and refrigerated "straight trucks," which are approximately 20 feet long and weigh 33,000 pounds. (DSUMF ¶ 11.)

Once loaded, Defendant's route drivers transport the products to customers, including grocery stores, convenience stores, and hospitals, on their assigned routes. (DSUMF ¶¶ 6, 11, 12.) These permanent route drivers deliver the same products to the same customers based on standing or pre-determined orders, and all of the trucks on these routes contain out-of-state products shipped from Dean Foods's plants and distribution centers. (DSUMF ¶ 12.) Defendant

---

[2] Defendant has provided a long list of specific products that originated outside of Florida and were delivered by Defendant to customers in Florida during Plaintiff's employment. (*See* DSUMF ¶ 7.)

also employs "swing" drivers, who cover for route drivers who are absent from work. (DSUMF ¶ 12.) Because the products are perishable, they are typically delivered to customers within one or two days from the time they arrive at Defendant's distribution center. (DSUMF ¶ 12.)

Many of the products that Defendant distributes in Florida are destined for locations or are consumed outside Florida. (DSUMF ¶ 8.) For instance, Defendant regularly delivers its products to both (1) Sky Chefs, which furnishes the airlines operating out of South Florida with food and beverage items that are ultimately offered to passengers on flights, and (2) various cruise lines operating out of South Florida and which travel to the Caribbean and Central America. (DSUMF ¶ 8.) In addition, Defendant advertises its export distribution capability for companies located in the Caribbean and Central America. (DSUMF ¶ 8.) Defendant regularly orders enough product from Dean Foods's out-of-state plants to cover one week's worth of volume based on highly accurate forecasts derived from customers' sales history, preexisting standing orders, and special orders. (DSUMF ¶ 10.) Defendant is either the owner or bailee of the products it sells to customers, all of which are designed to increase its sales, revenues, and profits. (DSUMF ¶ 10.)

Plaintiff, a career commercial truck driver, worked for Defendant as a "swing" route driver from March 2007 through September 2008, when Defendant terminated him, alleging insubordination. (DSUMF ¶ 13.) Plaintiff's primary duty was to fill in for absent route drivers and deliver dairy products to Defendant's customers in Miami-Dade and Broward Counties. (DSUMF ¶ 13.) In addition, Plaintiff placed the products on store shelves and picked up damaged merchandise and empty crates, which he returned to Defendant. (DSUMF ¶ 13.)

Each Saturday, Plaintiff and other swing drivers received their route assignments for the

upcoming week.  (DSUMF ¶ 14.)  Plaintiff regularly delivered to a number of wholesale customers, including Wal-Mart, Publix, Winn-Dixie, Target, and K-Mart.  (DSUMF ¶ 14.)  These customers typically have standing or predetermined orders, so that the same types and quantities of products are delivered to them each week.  (DSUMF ¶ 14.)  According to Defendant's corporate representative, William Davis, after arriving at a wholesale customer's store with the standard product mix, Plaintiff would "make the order when he gets into the store." (PSUMF ¶ 13.)  Plaintiff "would walk in.  He would check his inventory of what he has, fill his shelf up, and then he would make his order.  He would know basically what the store needs to get by until the next delivery." (Dep. of William Davis, 34:14-18.)

In performing his duties, Plaintiff regularly drove a straight truck on public streets and interstate highways.  (DSUMF ¶ 16.)  Plaintiff could have been called upon to deliver any of the out-of-state products regularly transported on Defendant's wholesale route.  (DSUMF ¶ 24.)  In fact, all of the routes Plaintiff drove during his employment with Defendant required the delivery of products shipped from outside the State of Florida.  (DSUMF ¶ 24.)  Plaintiff also delivered perishable dairy products to Sky Chefs, a catering company that supplied the food and beverages for the airlines operating out of international airports in south Florida.  (DSUMF ¶ 15.)  William Davis testified, though, that he did not know if any of the businesses to which Plaintiff delivered Defendant's products would take the products and send them to a location outside Florida or to another country.  (PSUMF ¶ 24.)

Defendant is required to register, and is registered, with the Federal Motor Carrier Safety Administration ("FMCSA") of the United States Department of Transportation ("USDOT"). (DSUMF ¶ 17.)  Operating under USDOT Number 85840, Defendant is registered as a motor

4

private carrier authorized to haul refrigerated food and dairy products. (DSUMF ¶ 17.) In the past two years, Defendant's trucks were subjected to 22 USDOT inspections and its drivers were inspected 39 times. (DSUMF ¶ 17.)

Defendant also requires that its route and delivery drivers comply with the Federal Motor Carrier Safety Regulations ("FMCSR"), including commercial driver licensure, medical fitness, and drug and alcohol testing. (DSUMF ¶¶ 18, 20.) Defendant provides USDOT instruction to its drivers on a regular basis and schedules and monitors the service hours of its drivers so that they are in compliance with the detailed hours of service regulations governing drivers of vehicles in interstate commerce operations. (DSUMF ¶ 19.) Defendant maintains all required USDOT records evidencing such compliance and also maintains a "driver qualification" file for each driver as required by the FMCSR. (DSUMF ¶ 19.)

During his employment with Defendant, and in compliance with USDOT regulations, Plaintiff conducted a safety inspections of the trucks he drove prior to setting out on his route each day. (DSUMF ¶¶ 19, 21.) Each day, he checked the horn, lights, blinders, brakes, and windshield wipers to make sure they were working properly. (DSUMF ¶ 21.) Moreover, Plaintiff was required to keep, and kept, a notebook containing the inspection checklist in case he was stopped by the USDOT. (DSUMF ¶ 21.)

Plaintiff filed his Complaint to begin this action on September 18, 2008, alleging a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, based upon Defendant's alleged failure to properly compensate him for overtime hours worked.[3] (D.E. 1.)

---

[3] The Court notes Plaintiff's argument that his Complaint contains a claim for minimum wage violations and, as such, Defendant is not entitled to summary judgment with respect to such claim because the Motor Carrier Exemption is inapplicable to minimum wage violations. (Pl.'s

5

On March 27, 2009, Defendant filed the instant Motion for Summary Judgment, arguing that it is entitled to summary judgment on Plaintiff's claims pursuant to the Motor Carrier Exemption. (D.E. 20.)

## LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. When

---

Resp. 2.)  Having closely reviewed the Complaint, the Court is satisfied that Plaintiff did not intend to allege minimum wage violations.  Plaintiff's counsel has represented and continues to represent a great many plaintiffs seeking damages against their former employers for violations of the FLSA and uses the same general form complaint in each of the lawsuits his office brings, changing a few identifying details from case to case.  On occasion, such as in this case, Plaintiff's counsel forgets to change certain of the factual and/or legal allegations from his previous usage of this form complaint; as a result, allegations sometimes appear that make no sense given the complaint's allegations as a whole.  For instance, although Plaintiff was a delivery driver for Defendant and only one Defendant was sued, his complaint alleges that "[s]everal other similarly situated security guards were not paid overtime and minimum wages during this time period who worked for the Defendants . . . ."  (Compl. ¶ 5.)  In addition, Plaintiff alleges that his work affected interstate commerce "because the places or materials that he guarded and/or used . . . moved through interstate commerce . . . ."  (Compl. ¶ 9.)  From these examples, it is clear that certain allegations in Plaintiff's Complaint were simply erroneously carried over from a previous complaint.

The Court believes that any reference to minimum wage violations in the Complaint is similarly erroneous.  Although Plaintiff mentions several times that he is bringing claims for minimum wage violations, the operative allegations focus solely on Plaintiff's overtime claims. (*See* Compl. ¶ 11 ("Plaintiff was not paid overtime wages as required by the Fair Labor Standards Act for any of the hours that he worked for the Defendants in excess of forty hours weekly"); *see also* Compl. ¶ 12 ("Defendants [*sic*] willfully and intentionally refused to pay Plaintiff the overtime wages as required by the law of the United States as set forth above").)

Even were the Court to conclude that Plaintiff meant to bring a claim for minimum wage violations, Defendant would be entitled to judgment on the pleadings, considering Plaintiff's allegations that he worked an average of 72 hours per week for Defendant and was compensated at a rate of $22 per hour, far in excess of the minimum wage for the applicable time period.  (See Compl. ¶¶ 7, 10, 11.)

determining whether the moving party has met this burden, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).[4] Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts then the court should deny summary judgment. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with

---

[4] Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## MOTOR CARRIER EXEMPTION

Under the FLSA, an employer must compensate employees for hours worked in excess of forty per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Defendant argues that Plaintiff is exempt under the motor carrier exemption, 29 U.S.C. § 213(b)(1), and therefore not entitled to overtime compensation. The employer has the burden of proving the applicability of the FLSA exemption. *Klinedinst v. Swift Inv., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001). Exemptions to the FLSA "are to be narrowly construed against the employer who asserts them." *Jeffery v. Sarasota White Sox, Inc.*, 694 F.3d 590, 594 (11th Cir. 1995); *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997).

Under § 213(b)(1) of the FLSA, the provisions of § 207 "shall not apply with respect to [ ] any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502[5] of

---

[5] As relevant to this action, section 31502(a)(1) limits the application of § 31502 to transportation "described in section[] 13501" of Title 49. 49 U.S.C. § 31502(a)(1). Significantly, § 13501 of Title 49 gives the Secretary of Transportation jurisdiction over

Title 49." 29 U.S.C. § 213(b)(1).  As a fellow district court has observed, "[t]he Department of Labor's jurisdiction under the FLSA and the Department of Transportation's jurisdiction under the Motor Carrier Act are mutually exclusive and there is no overlapping jurisdiction." *Morrison v. Quality Transports Servs., Inc.*, 474 F. Supp. 2d 1303, 1309 n.2 (S.D. Fla. 2007) (citing *Morris v. McComb*, 332 U.S. 422, 437-38 (1947)).

The applicable regulations explain that the Secretary of Transportation has the authority to establish maximum hours and qualifications of service for employees, and thereby trigger application of the motor carrier exemption, if two requirements are met: (1) an employee plaintiff must "be employed by carriers whose transportation of passengers or property by motor vehicle is subject to [the Secretary's] jurisdiction" under the Motor Carrier Act; and (2) an employee plaintiff must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act."  29 C.F.R. § 782.2(a). "In order to avoid any conflicts between these Acts, Congress decided that the Secretary of Transportation need not actually exercise his or her power to regulate under the Motor Carrier Act and that the FLSA's § 213(b)(1) exemption applies so long as the Secretary has the authority to regulate over a particular category of employees."  *Id*. (citing *Spires v. Ben Hill County*, 980 F.2d 683, 686 (11th Cir. 1993)).

## ANALYSIS

---

transportation by motor carriers to the extent that passengers, property, or both are transported by motor carrier between a place in a State and a place in another State; a State and another place in the same State through another State; or the United States and a place in a foreign country to the extent the transportation is in the United States. 49 U.S.C. § 13501.

9

Defendant first argues that the fact that the Secretary of Transportation has exercised jurisdiction over Defendant establishes the first prong of the motor carrier exemption: that Defendant is a carrier whose transportation of cargo is subject to the Secretary's jurisdiction under the Motor Carrier Act.  According to Defendant, USDOT has already exercised jurisdiction over it because: (1) in the past two years, USDOT has inspected Defendant's trucks 22 times and its drivers 39 times; (2) Defendant is registered with the FMCSA as a hauler of cargo in interstate commerce; (3) Defendant is registered with USDOT as a motor private carrier authorized to haul refrigerated food and dairy products; (4) all of Defendant's delivery trucks are placarded with its USDOT registration number; (5) Defendant provides USDOT instruction to its drivers on a regular basis and schedules and monitors the service hours of its drivers so that they are in compliance with the FMCSR, including hours of service regulations governing drivers of vehicles used in interstate commerce at 49 C.F.R. Part 395; (6) Defendant maintains required USDOT records evidencing such compliance and also maintains a "driver qualification file" for each driver as required by 49 C.F.R. § 391.51(a); (7) Defendant's drivers are subject to pre-hire and random drug and alcohol testing required by the FMSCR, as well as pre-hire physical examinations; and (8) each of Defendant's drivers is required to conduct daily pre-trip vehicle inspections.  (Def.'s Mem. 8.)  The Court agrees.

In *Baez v. Wells Fargo Armored Services Corp.*, the Eleventh Circuit found that the fact that the defendant held a permit issued by the Interstate Commerce Commission ("ICC")[6]

---

[6] At the time *Baez* was decided, the ICC enjoyed motor carrier operating authority responsibilities.  In 1995, Congress passed the ICC Termination Act, which transferred motor carrier operating authority responsibilities to the Department of Transportation (DOT). Pub. L. No. 104-88, §§ 103-104, 109 Stat. 803 (1995) (codified as amended at 49 U.S.C. § 13501 (2000)).

indicated "that jurisdiction has already been exercised," making it "clear that [the defendant] [was] a motor carrier subject to the Secretary's jurisdiction."  938 F.2d 180, 182 (11th Cir. 1991) (citations omitted), *cert. denied*, 502 U.S. 1060 (1992).  Additionally, in *Walters v. American Coach Lines of Miami, Inc.*, the undersigned found, relying on *Baez* and *Morrison*,[7] that the defendant was a motor carrier whose transportation of property or passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act based upon the undisputed evidence that the defendant (1) was licensed by the USDOT and held all of the authorizations required of interstate motor carriers of passengers issued by the FMCSA; (2) had been issued a USDOT number by the FMSCA evidencing its right to engage in interstate commerce subject to the FMSCA's safety regulations; (3) made extensive efforts to comply with federal requirements for interstate drivers; (4) required its drivers to become qualified to drive all types of vehicles used by it for passenger transportation and maintained a "driver qualification file" for each driver as required by 49 C.F.R. § 391.51(a); (5) was required to comply with the FMCSR, including hours of service regulations governing drivers of vehicles used in interstate commerce at 49 C.F.R. Part 395 and to maintain required USDOT records evidencing such compliance; (6) subjected its drivers to random drug alcohol testing required by the FMSCR; and (7) had been audited by the USDOT. 569 F.Supp. 2d 1270, 1282-83 (S.D. Fla. 2008).

Thus, applying *Baez*, *Walters*, and *Morrison* to the undisputed record evidence, the Court

---

[7] In *Morrison*, the court found that the defendant demonstrated that it was a motor carrier whose transportation of property or passengers was subject to the Secretary's jurisdiction under the Motor Carrier Act based on evidence that (1) the defendant held a USDOT license; (2) the defendant operated vehicles whose weight or passenger capacity fell within the authority of the FMSCA; and (3) the defendant was subject to regulation by the FMSCA including regular inspections by the USDOT.  474 F.Supp. 2d at 1309.

finds that because the USDOT has already exercised jurisdiction over Defendant, Defendant is a motor carrier whose transportation of property is subject to the Secretary's jurisdiction under the Motor Carrier Act.  The Court further notes that Plaintiff does not appear to dispute that Defendant has satisfied the first prong of the motor carrier exception.  (*See generally* Pl.'s Resp.)

Having determined that Defendant is a carrier whose transportation of property is subject to the Secretary's jurisdiction under the Motor Carrier Act, the Court must next determine whether, as a matter of law, Plaintiff engaged in activities of a character directly affecting the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act, or whether there are genuine issues of material fact that preclude such a determination by the Court at this stage in the litigation.

The applicable regulations explain that "[t]he work of an employee who is a full-duty or partial duty 'driver,' . . . directly affects 'safety and operation' . . . whenever he drives a motor vehicle in interstate or foreign commerce within the meaning of [the Motor Carrier Act]."  29 C.F.R. § 782.3(b).  As a full-duty, swing route driver who transported products by truck in interstate highways, Plaintiff engaged in activities of a character directly affecting the safety of operation of motor vehicles; thus, the issue before the Court is whether Plaintiff was engaged in interstate or foreign commerce within the meaning of the Motor Carrier Act.

It is clear from the undisputed evidence in the record that during the relevant time period, Defendant served a territory within Florida, and that Defendant did not use its trucks to transport any goods outside of the State of Florida.  However, Defendant argues that although it solely engaged in intrastate transportation of goods, its transportation of dairy products within the State of Florida can be considered interstate commerce for purposes of the motor carrier exemption

12

because it forms part of a "practical continuity of movement" across state lines from the point of origin to the point of destination. (Def.'s Mot. 10 (citing *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943).) Defendant contends that it has established a "practical continuity of movement" in two ways: (1) Defendant's delivery drivers, including Plaintiff, regularly deliver products that originated outside of Florida and (2) Defendant's delivery drivers, including Plaintiff, regularly deliver products that are intended for ultimate consumption outside of Florida.

Under the applicable regulations, in order for transportation to be considered part of a "practical continuity of movement" across state lines, the shipper must have a fixed and persisting transportation intent beyond the terminal storage point at the time of shipment. *See* 29 C.F.R. § 782.7(b)(2) (citation omitted). A fixed and persisting intent does not exist where: (1) at the time of the shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (2) the terminal storage is a distribution point or a local marketing facility from which specific amounts of the product are sold or allocated, and (3) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage. 29 C.F.R. § 782.7(b)(2) (citation omitted). Courts interpreting these regulations have held that each of these three factors must be met in order to conclude that a fixed and persisting intent is absent. *See, e.g., Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 411 (6th Cir. 1970) (stating that drivers are not engaged in interstate commerce where all "three factors are present" and finding motor carrier exemption inapplicable because "[e]ach of these three factors is present in the instant action").

Plaintiff maintains that Defendants have not provided conclusive proof regarding the

13

third "fixed and persisting intent" factor, specifically, whether transportation in the furtherance of such distribution within a single State is specifically arranged only after sale or allocation from storage. (Pl.'s Resp. 4.)  Plaintiff points to certain portions of William Davis's deposition in support of its contention that the goods sold on Plaintiff's routes did not have a pre-determined destination to specific customers before Plaintiff began his route. (*See* Pl.'s Resp. 4-5.)  The Court first notes that Plaintiff has not addressed the first two elements of the "fixed and persisting intent" test and that based on the section 782.7(b)(2) and *Baird*, all three elements must be present for the Court to find that no fixed and persisting intent existed.

Further, even crediting Plaintiff's aforementioned contention, the Court would still find, pursuant to Eleventh Circuit precedent, that Defendant's drivers, including Plaintiff, were engaged in transportation that could be considered a "practical continuity of movement" across state lines because of their deliveries to Sky Chefs.  In *Baez*, the Eleventh Circuit held, relying on *Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37 (5th Cir. 1962), that even though the guards on armored bank trucks did not cross state lines, they were engaged in interstate commerce because the check and other instruments transported in the trucks were bound for banks outside the State of Florida. 938 F.2d at 182; *see also Opelika*, 299 F.2d at 40-42 (finding motor carrier exemption applicable where drivers who never crossed state lines in their transportation of empty soft drink bottles were nevertheless engaged in interstate commerce because the empty bottles were destined for a bottling plant in another state).  Here, the undisputed evidence demonstrates that Defendant's products that Plaintiff delivered to Sky Chefs were bound , at the time they were delivered, for a destination outside of Florida, specifically,

international airspace.[8]  As such, the Court finds that Plaintiff engaged in interstate or foreign commerce within the meaning of the Motor Carrier Act and, thus, Plaintiff is exempt from the overtime provisions of the FLSA by virtue of the motor carrier exemption.  *See, e.g., DeMaria v. Ryan P. Relocator Co.*, 512 F.Supp. 2d 1249, 1254 (S.D. Fla. 2007) (stating that in *Baez* and *Alvarado*, the courts "found that the Motor Carrier Exemption was applicable because, although the plaintiffs only engaged in intrastate transportation, the goods which they transported were ultimately bound for interstate destinations.")  Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (D.E. 20) is GRANTED.  Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

DONE AND ORDERED in Chambers at Miami, Florida, this _11th_ day of May, 2009.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided:
counsel of record

---

[8] The Court notes and rejects Plaintiff's contention that William Davis's deposition testimony creates a genuine issue of material fact as to whether Plaintiff delivered products that were destined for locations outside of Florida.  William Davis stated that he "wouldn't know" whether "any of the businesses that [Plaintiff] delivered to . . . would take those products and send them to a location outside the state of Florida or to another country" (*See* Dep. of William Davis 35:10-15.)  The deliveries to Sky Chefs can be considered outside the scope of this comment because Sky Chefs do not take Defendant's products and send them to a location outside of Florida but rather sell Defendant's products to airlines that then take them outside of Florida.  (*See* DSUMF ¶ 8.)  Additionally, based upon William Davis's affidavit testimony regarding Defendant's sales to Sky Chefs (*see* Aff. of William Davis ¶ 12) and the undisputed evidence that Plaintiff made deliveries to Sky Chefs (*see* DSUMF ¶ 15), the Court is satisfied that no genuine issue of material fact exists as to whether Plaintiff delivered products that were destined for locations outside of Florida.  The deposition testimony in question likely relates to William Davis's knowledge of whether grocery and convenience stores would send Defendant's products to locations outside of Florida.